# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 3, 2026

Lyle W. Cayce
Clerk

———————

No. 24-50784

———————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

MIGUEL ANGEL DELGADO, JR.,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:23-CR-466-1

_____

Before ELROD, *Chief Judge*, and SMITH and WILSON, *Circuit Judges*.
JERRY E. SMITH, *Circuit Judge*:

Miguel Delgado, Jr., a U.S. Customs and Border Patrol ("CPB") officer, challenges the sufficiency of the evidence after being convicted, following a three-day bench trial in which the government presented extensive evidence, on two counts of depriving an individual of rights under color of law in violation of 18 U.S.C. § 242 and one count of destruction, alteration, or falsification of records in a federal investigation in violation of 18 U.S.C. § 1519. Delgado presented no evidence.

Although the precise facts of the events of the two incidents in ques-

1

No. 24-50784

tion are the main contentions on appeal, we put a heavy thumb on the scale in favor of the verdict because we do not reevaluate the weight of the evidence or credibility of witnesses. Indeed, on a challenge to sufficiency, we must affirm if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Because Delgado failed to satisfy the burden of showing that no rational factfinder could have found guilt, we affirm.

## I.

The district court found that the government had proven beyond a reasonable doubt each element of the offenses contained in Counts I, II, and III of the Indictment. The court sentenced Delgado to 24 months for each count (below the guideline recommendation), to run concurrently, followed by three-year concurrent terms of supervised release.

### A. Tomas Espinosa Incident

In October 2019, Delgado, while working at the Bridge of Americas Port of Entry, encountered Espinosa, who was crossing the United States–Mexico border. Although there are some allegations that Espinosa was intoxicated, he testified that he had "an alcoholic beverage" and "was not drunk or tipsy or buzzed." Espinosa became upset at another CBP officer and told the officer, "you come here," to which the officer responded for him to "come here." Delgado, who was not the primary officer engaging with Espinosa, approached Espinosa, put his hands on him to provide an escort hold, took him to the ground after he appeared to take a different stance, and handcuffed him. Delgado's supervisor Mark Ferguson testified that Espinosa was "noncompliant" in the waiting area during this initial interaction.

Delgado then escorted Espinosa to a different area, where he allegedly did not give Espinosa any instructions on where to go. Importantly, Del-

2

No. 24-50784

gado's supervisor did not assert that Espinosa was resisting when Espinosa, given Delgado's redirection, made contact with the door.[1]  As a result, Espinosa got lightheaded, and his head began to hurt.  Espinosa also testified that he experienced dizziness, ringing in the ears, and confusion.  There is undisputed evidence regarding Espinosa's injuries.

Although Delgado avers that the force against Espinosa was not excessive, Delgado's supervisor testified that he would have intervened to stop the exchange and noted that Delgado had acted in an aggressive manner. To be sure, there is testimony from Delgado's supervisor that Espinosa resisted Delgado's attempt to handcuff him during their initial interaction, but an expert witness, Matthew Harvey, in comparing video evidence to written reports testified that he did not see Espinosa "acting in any way that was criminal that would justify using excessive force."  The expert went further, indicating there was "no reason to go out and engage with Espinosa" and that "Delgado both instigated and escalated the incident with Espinosa."  He also testified that "the video shows signs that Delgado intended to slam Espinosa into a door" and that "he did not see any indication of resistance on the part of Espinosa."  Delgado's supervisor and the expert witness both agree that Delgado's behavior was not reasonable.

## B. Ricardo Estrada Incident

In June 2020, Delgado had an encounter with Ricardo Estrada, who was returning from Mexico to the United States.  Upon presenting himself for immigration inspection, Estrada was referred to passport control secondary, where he approached Delgado's counter.  Estrada asked why the officer, who referred him to passport control, needed to yell, but Delgado told

---

[1] It appears that Espinosa stumbled as Delgado redirected him, then both fell into the door as a result.

Estrada to stay home if it bothered him.  After Estrada said that he would not stay home, Delgado began insisting, "This is my house" and "You are not the boss here."  After a brief back and forth exchange, Delgado told Estrada to sit down "[l]ike a scolded little child" and to "[p]ut away the f--king phone."  Estrada complied and sat silently in the waiting area.

Estrada remained silent and seated.[2]  Then Delgado started saying "the only one who is going to lose . . . is you" and that Estrada would lose every time he crossed the border.  Estrada then said to Delgado in Spanish, "[t]his might be your house but when we get outside, that is a different story."  After Delgado asked whether Estrada was threatening him, Estrada reassured him that he was not.  Nevertheless, Delgado called him a "f--king big mouth," then "walked from behind a barrier, opened a locked door to a secure area, and shouted at him to approach."  Although Delgado perceived this to be "a direct threat on his life," he brought Estrada into a secure area without alerting another officer or checking Estrada for weapons.[3]

Complying with Delgado's request, Estrada approached, and Delgado "grabbed his arms from behind him, pushed him forward several steps," and redirected him.  Delgado "twisted his arm, pressed his face into the chairs, and shouted at him as [] Estrada cried out in pain," all while Estrada protested that he was not threatening anyone.  From the scuffle, Estrada suffered a nose laceration and bleed.  CBP Officer Caros Valenzuela personally ob-

_____

[2] Delgado has a different version of events about this, namely that "Estrada continued to yell" after being told to sit and calm down.

[3] In briefing, Delgado states that he "proceeded to call over Estrada to place him in restraints and pat him down in order to ensure that he was not carrying any weapons, and to also attempt to contact Federal Protective Services to see if anyone would be able to respond."  But Delgado does not confirm whether he patted Estrada down or waited for the other officer, and it is unclear why Delgado needed Estrada to approach in the first instance if he was really ascertaining whether another officer could respond.

served that Estrada had a laceration at the top of his nose and was crying. There is undisputed evidence regarding Estrada's injuries. When Valenzuela arrived on the scene, he observed Delgado yelling at Estrada and did not believe that Estrada was being unruly when Delgado pushed him against the chairs. Valenzuela did not hear Estrada threaten anyone; he heard Estrada apologizing.

Although Delgado posits that the amount of force was not excessive, expert witness Harvey testified that Delgado appeared, based on the threat level indicated by the video, to have used excessive force in handcuffing Estrada. The expert also testified that he "did not observe any threatening behavior from Estrada" and opined that "Estrada did not appear to instigate before Delgado placed his hands on Estrada." In fact, Estrada repeatedly said, throughout the interaction, that he was not threatening Delgado.

Even though the witnessing officer had a duty to intervene if he saw unnecessary or excessive force (but did not intervene here), Delgado's supervisor testified that he would have intervened to stop Delgado's escalation because it was "unnecessary." The supervisor indicated that officers are not trained to restrain a subject by putting handcuffs on him or pushing his head and face into other objects. The supervisor further stated that "Delgado's conduct was . . . unbecoming to an officer and neither reasonable nor necessary." And special agent Michael Navarro also testified that Delgado's use-of-force "did not seem reasonable and necessary."

## C. Falsification of a Report

Minutes after the Estrada incident, Delgado's supervisor inquired about what had occurred, and Delgado responded with a false account. Delgado also wrote a false report about the incident,[4] which was reviewed by

---

[4] As a general matter, officers were "trained to document any excessive use of force

agents for the CBP Office of Professional Responsibility and DHS Office of Inspector General.  In the report, Delgado wrote some falsehoods, namely that he turned Estrada in his chair to place him in hand restraints; however, expert witness Harvey found, on the footage, that Estrada appeared to be on his knees with his head up against the back of the chairs and the wall and was not sitting upright until he got handcuffed.  Delgado wrote that Estrada kept pushing back, but the expert witness did not notice any movement to indicate that Estrada was resisting or pushing back against Delgado.

## II.

Although we review the denial of a motion for judgment of acquittal *de novo*, any review of challenges to the sufficiency of the evidence is "highly deferential to the verdict." *United States v. Cervantes*, 107 F.4th 459, 465 (5th Cir. 2024). Indeed, we review "the evidence and all reasonable inferences in the light most favorable to the prosecution and to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

A defendant seeking reversal "swims upstream." *United States v. Rodriguez*, 136 F.4th 258, 268 (5th Cir. 2025).  "[I]t is not the reviewing court's role to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Id.* at 265 (alteration and emphasis in original; internal quotation marks omitted).  Instead, we "*must* affirm if, after viewing the evidence in the light most favorable to the prosecution, [we] conclude[] that *any* rational trier of fact could have found the essential elements of the crime beyond  reasonable doubt." *Id.* at 268 (emphasis in original; internal quotation marks omitted).

A defendant has the burden to show that no rational factfinder could

---

before the end of any shift."

have found guilt. *See United States v. Waguespack*, 935 F.3d 322, 331 (5th Cir. 2019). We put "a heavy thumb on the scale in favor of the verdict." *United States v. Cabello*, 33 F.4th 281, 288 (5th Cir. 2022). Further, "[w]e do not reevaluate the weight of the evidence or . . . the credibility of the witnesses." *United States v. Fields*, 977 F.3d 358, 363 (5th Cir. 2020) (alteration in original). Importantly, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence; the jury is free to choose among reasonable constructions of the evidence." *Id.* (alteration in original). "And we must accept all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict." *United States v. Scott*, 70 F.4th 846, 856 (5th Cir. 2023) (internal quotation marks omitted).

### III. Deprivation of Rights under Color of Law: 18 U.S.C. § 242

There is sufficient evidence to support the two counts of conviction for deprivation of rights. Such a violation "requires an individual to: 1) willfully; 2) deprive another of a federal constitutional right; 3) under color of law." *United States v. Brugman*, 364 F.3d 613, 616 (5th Cir. 2004).

### A. Under Color of Law

Delgado was acting under color of law when he used force in both instances—he was in uniform and on duty while asserting his authority as a federal officer.

### B. Willfully

There is sufficient evidence that a defendant acted "willfully" when "a defendant act[s] 'in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite.'" *Id.* (quoting *Screws v. United States*, 325 U.S. 91, 105 (1945)). Evidence of willfulness "is usually circumstantial." *United States v. Sertich*, 879 F.3d 558, 565 (5th Cir. 2018).

There are three reasons supporting a rational finding that Delgado

acted willfully. First, Delgado violated his training on the use of force.[5] Delgado was trained not to use force to ensure compliance for a subject who was not or had stopped resisting. He also received training making it clear that permissible uses of force did not include "slamming a person into a door, slamming a person into chairs, or grabbing a person's arm and jerking it up until they cry out in pain." Second, Delgado's demeanor supports the inference that he was not merely acting to enforce the law—he was "yelling, cursing, and banging objects around despite being inside a secure government facility."[6] Third, with respect to the Espinosa incident, Delgado made efforts to conceal his conduct, which he knew were likely unlawful.[7] Delgado lied to his supervisor and in a written report about the Espinosa incident.

## C. Deprivation of a Federal Constitutional Right

Delgado violated the Fourth Amendment by using excessive force, which is defined as "'(1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable.'" *Brugman*, 364 F.3d at 616.

---

[5] *See United States v. Hill*, 99 F.4th 1289, 1307 (11th Cir. 2024) (noting that "where [the] officer's actions so obviously violate his training on the use of force, a jury may infer that the violation was willful" and "[s]uch an inference may be stronger when a defendant repeatedly uses force exceeding that authorized by his training" (citation omitted)), *cert. denied*, 145 S. Ct. 2698 (2025).

[6] *See United States v. Diaz*, 498 F. App'x 407, 413 (5th Cir. 2012) (per curiam) (holding that evidence that an officer was "'mad,' 'angry,' and 'yelling,'" while dealing with an otherwise secure scene, supported an inference of willful misconduct).

[7] *See United States v. Brown*, 934 F.3d 1278, 1297 (11th Cir. 2019) (noting that an officer's "attempt[s] to conceal his actions by making false statements in his incident reports," after a pattern of constitutional violations, supported the inference that he acted willfully); *see also Sertich*, 879 F.3d at 565 ("Willfulness may be established by . . . 'any conduct, the likely effect of which would be to mislead or to conceal.'").

No. 24-50784

### 1. Tomas Espinosa Incident

#### a. Injury

There is undisputed evidence that Delgado caused Espinosa's injuries. Specifically, Espinosa became lightheaded, and his head began to hurt because Delgado redirected him and both fell into the door. Espinosa testified that he experienced dizziness, ringing in the ears, and confusion.

#### b. Excessive Force

There is sufficient evidence to support a finding that Delgado used excessive force on Espinosa. His supervisor testified that he would have intervened to stop the exchange and noted that Delgado had acted in an aggressive manner. Even if, according to Delgado's supervisor, Espinosa were allegedly "noncompliant" during his *initial* interaction with Delgado in the *waiting* area, Delgado escorted Espinosa to a *different* area, where he redirected him and both fell into a door at a time when Espinosa was not resisting. That evidence, viewed in the light most favorable to the government, supports a finding that force was excessive.[8]

#### c. Objectively Unreasonable

There is sufficient evidence to support a finding that Delgado's conduct toward Espinosa was objectively unreasonable. To be sure, there is testimony from Delgado's supervisor that Espinosa resisted Delgado's attempt to handcuff him during their *initial* interaction in the waiting area. But there are two rejoinders. One, Espinosa was not resisting when Delgado redirected him and fell into the door. Second, the testimony of Delgado's supervisor, that Espinosa was at least initially resisting, was called into question by that

---

[8] *See United States v. Lott*, 53 F.4th 319, 322 (5th Cir. 2022) (noting that an appellate court does not "weigh the evidence or determine the credibility of witnesses" and "view[s] all evidence in the light most favorable to the government and defer[s] to all reasonably inferences drawn by the trial court").

of expert witness Harvey, who testified that he did not witness, on the video, Espinosa "acting in any way that was criminal that would justify using excessive force." The expert went further, indicating there was "no reason to go out and engage with Espinosa" and that "Delgado both instigated and escalated the incident with Espinosa." He also testified that "the video shows signs that Delgado intended to slam Espinosa into a door" and that "he did not see any indication of resistance on the part of Espinosa."

The expert's testimony suggests that Espinosa was "at most passively resistant" throughout—any excessive physical force was objectively unreasonable.[9] Despite the purported inconsistency between the testimonies about the initial interaction and related ambiguous video evidence, we must view all the evidence in the light most favorable to the government on a challenge to sufficiency of the evidence; our review is "highly deferential to the verdict." *See United States v. Cervantes*, 107 F.4th 459, 465 (5th Cir. 2024). It is notable that Delgado's supervisor and the expert witness agree that Delgado's behavior was not reasonable—Delgado's supervisor said the behavior was "neither reasonable nor necessary," and the expert witness said it was "neither reasonable [n]or appropriate."

A "rational trier of fact could have found," beyond a reasonable doubt, that Delgado willfully violated Espinosa's Fourth Amendment rights under color of law. *See id.*; *Brugman*, 364 F.3d at 616.

### 2. Ricardo Estrada Incident

#### a. Injury

There is undisputed evidence that Delgado caused Estrada's injuries.

––––––––––––––––––––

[9] *See Brugman*, 364 F.3d at 617 (determining that the "physical force [the defendant] used in excess . . . was objectively unreasonable" because the subject of the use of force had been "at most passively resistant").

No. 24-50784

Delgado "grabbed [Estrada's] arms from behind him, pushed him forward several steps," and redirected him into a row of plastic chairs. While Estrada protested that he was not threatening anyone, Delgado "twisted his arm, pressed his face into the chairs, and shouted at him as [] Estrada cried out in pain." Because of Delgado's conduct, Estrada bled from a nose laceration, which Officer Caros Valenzuela personally observed.

### b. Excessive Force

There is sufficient evidence to support an excessive-force finding. Although Delgado contends that the amount of force against Estrada was not excessive, expert witness Harvey testified that Delgado appeared, based on the threat level indicated by the video, to have used excessive force in hand-cuffing Estrada. Notably, the expert testified that he "did not observe any threatening behavior from Estrada."

Even though the witnessing officer had a duty to intervene if he saw unnecessary or excessive force but did not intervene here, Delgado's supervisor testified that he would have stopped Delgado's escalation because it was "unnecessary." The witnessing officer's lack of intervention is no conclusive indication that the force was not excessive. For one, the officer may not have intervened when he or she should have, particularly if the force was indeed excessive. Second, the force was excessive because Delgado's supervisor would have intervened to stop the "unnecessary" escalation. Third, the video evidence, viewed in the light most favorable to the government, suggests the force was excessive.[10]

### c. Objectively Unreasonable

There is sufficient evidence to support a finding that Delgado's con-

---

[10] *See United States v. Rodriguez*, 136 F.4th 258, 268 (5th Cir. 2025) (noting that the appellate court "view[s] the evidence in the light most favorable to the prosecution").

duct toward Estrada was objectively unreasonable. Admittedly, it is unclear[11] whether Estrada's actions *before* being handcuffed could be described as merely "passively resistant" because he engaged in a verbal back-and-forth with Delgado during their *initial* interaction at passport control secondary. But their subsequent interaction is clearer. Delgado "walked from behind a barrier, opened a locked door to a secure area, and shouted at [Estrada] to approach."[12]  Even though Delgado perceived Estrada's statement, "[t]his might be your house but when we get outside, that is a different story," as a "direct threat on his life," he brought Estrada into a secure area without alerting another officer or checking him for weapons. We view this evidence in the light most favorable to the government—if Delgado was sincerely concerned for his safety, he would not have opened a locked door to a secure area, request that someone (who he supposedly perceived to be a threat) approach, fail to pat the subject down for weapons, or fail to wait for another officer, all while he was already separated by a barrier.[13]

The testimony from several witnesses supports the finding that Delgado's conduct was objectively unreasonable.  For one, Officer Valenzuela arrived on the scene, encountered Delgado yelling at Estrada, and did not believe that Estrada was being unruly when Delgado pushed him against the chairs.  And Valenzuela did not personally hear Estrada threaten anyone and,

---

[11] The parties dispute whether "Estrada continued to yell" after being told to sit and calm down.

[12] In briefing, Delgado states that he "proceeded to call over Estrada to place him in restraints and pat him down in order to ensure that he was not carrying any weapons, and to also attempt to contact Federal Protective Services to see if anyone would be able to respond."  However, Delgado does not confirm whether he patted Estrada down or waited for the other officer.  It strains credulity why Delgado needed Estrada *to approach* if he were ascertaining whether another officer could respond.

[13] *See Rodriguez*, 136 F.4th at 268 (viewing the evidence in the light most favorable to the prosecution on a sufficiency challenge).

in fact, witnessed Estrada apologizing to Delgado while he was kneeling. Second, Delgado's supervisor made clear that officers are not trained to restrain subjects by putting handcuffs on them and pushing their heads into other objects. His supervisor went further, stating that "Delgado's conduct was . . . unbecoming to an officer and neither reasonable nor necessary." Third, expert witness Harvey opined that "Estrada did not appear to instigate before Delgado placed his hands on Estrada" and reiterated that Estrada did not threaten Delgado during the interaction. Fourth, special agent Michael Navarro testified that Delgado's use-of-force "did not seem reasonable and necessary." Similarly, a "rational trier of fact could have found," beyond a reasonable doubt, that Delgado also willfully deprived Estrada of his Fourth Amendment rights under color of law. *See Cervantes*, 107 F.4th at 465; *Brugman*, 364 F.3d at 616.

IV. Knowingly Falsifying a Record with Intent to Impede: 18 U.S.C. § 1519

There is sufficient evidence to support the conviction of falsification of a record. Such a violation occurs when a person "knowingly . . . falsifies, or makes a false entry in any record [or] document . . . with the intent to impede, obstruct, or influence the investigation or proper administration of any matter" within a federal agency's jurisdiction "or in relation to or contemplation of any such matter." 18 U.S.C. § 1519. "[T]o sustain a § 1519 conviction, the defendant need not know that the investigation is ongoing or even imminent." *United States v. Plezia*, 115 F.4th 379, 395 (5th Cir. 2024). And "[t]here is no requirement that a defendant must know that his conduct is impeding or will impede a pending investigation." *United States v. Moore*, 708 F.3d 639, 649 (5th Cir. 2013).

> Section 1519 reaches:
>
> three instances where a defendant acts with intent to obstruct any investigation—formal or informal—within the jurisdiction of a federal agency: (1) when a defendant acts directly with re-

spect to the investigation or proper administration of any matter, that is, a pending matter, (2) when a defendant acts in contemplation of any such matter, and (3) when a defendant acts in relation to any such matter.

*Plezia*, 115 F.4th at 394–95. "[T]he belief that a federal investigation directed at the defendant's conduct might begin at some point in the future satisfies the 'in contemplation' prong." *United States v. Kernell*, 667 F.3d 746, 755 (6th Cir. 2012). "Intent may, and generally must, be proven circumstantially." *United States v. Maggitt*, 784 F.2d 590, 593 (5th Cir. 1986).

Mere minutes after the Estrada incident, Delgado's supervisor inquired about what had occurred, and Delgado responded with a false account. The fact that Delgado made these false verbal statements, soon after the incident in question, is instructive, insofar as they may have influenced Delgado's subsequent falsehoods in his written report; after all, there was an incentive for Delgado to have a consistent account of the events, even if the initial (albeit verbal) account were false.[14]

Since officers were "trained to document any excessive use of force before the end of any shift," it is plausible that Delgado knew that an investigation, based on the factual predicate in the documentation, might begin at some point in the future. Otherwise, documenting any excessive use of force, at the end of every shift, would be superfluous. Delgado, at least, thought that his conduct could be investigated, so he had an incentive to hide his allegedly inappropriate conduct.[15]

---

[14] *See United States v. Hunt*, 526 F.3d 739, 745 (11th Cir. 2008) (noting that a jury could infer from false statements immediately after a use of force that the defendant "was aware he may have engaged in wrongful behavior and that this awareness—being close in time to the false statement—influenced the statement in the report").

[15] *See United States v. Elashi*, 554 F.3d 480, 499 (5th Cir. 2008) ("[G]uilty knowledge can be inferred from false statements and attempted coverups.").

No. 24-50784

It is therefore unsurprising that Delgado wrote a false report about the incident, which was reviewed by agents for the CBP Office of Professional Responsibility and DHS Office of Inspector General. The specific falsehoods in the report are as follows: Delgado wrote that he turned Estrada in his chair to place him in hand restraints; however, expert witness Harvey found, on the footage, that Estrada appeared to be on his knees with his head up against the back of the chairs and the wall and was not sitting upright until he got handcuffed. Delgado also wrote that Estrada kept pushing back, but the expert witness did not notice any movement to indicate that Estrada was resisting or pushing back against Delgado.

A rational factfinder, considering these circumstances, could find that Delgado intended to impede a pending or completed federal investigation when he falsified his report.

AFFIRMED.